# United States Court of Appeals for the Federal Circuit

———————————

**AL GHURAIR IRON & STEEL LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, STEEL DYNAMICS, INC.,**
*Defendants-Appellees*

———————————

2022-1199

———————————

Appeal from the United States Court of International Trade in No. 1:20-cv-00142-TMR, Judge Timothy M. Reif.

———————————

Decided: April 12, 2023

———————————

ROBERT GOSSELINK, Trade Pacific PLLC, Washington, DC, argued for plaintiff-appellant.

KELLY GEDDES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, MOLLIE LENORE FINNAN, PATRICIA M. MCCARTHY; ELIO GONZALEZ, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, Washington, DC, for defendant-appellee United States Steel Corporation. Also represented by CHASE DUNN, JAMES EDWARD RANSDELL, IV, SARAH E. SHULMAN.

ALAN H. PRICE, Wiley Rein, LLP, Washington, DC, for defendant-appellee Nucor Corporation. Also represented by THEODORE PAUL BRACKEMYRE, TESSA V. CAPELOTO, ADAM MILAN TESLIK, MAUREEN E. THORSON, CHRISTOPHER B. WELD.

BENJAMIN JACOB BAY, Schagrin Associates, Washington, DC, argued for defendant-appellee Steel Dynamics, Inc. Also represented by MICHELLE ROSE AVRUTIN, NICHOLAS J. BIRCH, CHRISTOPHER CLOUTIER, ELIZABETH DRAKE, WILLIAM ALFRED FENNELL, JEFFREY DAVID GERRISH, LUKE A. MEISNER, KELSEY RULE, ROGER BRIAN SCHAGRIN.

———————————

Before NEWMAN, REYNA, and CUNNINGHAM, *Circuit Judges.*

REYNA, *Circuit Judge.*

Al Ghurair Iron & Steel LLC appeals a Court of International Trade judgment affirming a circumvention determination by the U.S. Department of Commerce ("Commerce"). Commerce determined that United Arab Emirates ("UAE") producers of certain corrosion-resistant steel ("CORE") were circumventing antidumping ("AD") and countervailing duty ("CVD") orders on CORE from China. In making its determination, Commerce analyzed the circumvention factors and subfactors provided by 19 U.S.C. § 1677j(b). AGIS argues that Commerce erroneously analyzed several of these factors and subfactors.

We find that Commerce's circumvention determination is reasonable and supported by substantial evidence. We conclude that Commerce's analysis of the "value added" subfactor is erroneous because Commerce did not reasonably explain why it rejected AGIS's financial data that were purported to show a significant value added. We find that this error was harmless because it was limited to a single factual finding within a multi-factor test. We thus affirm the Court of International Trade's judgment.

BACKGROUND

The China CORE AD and CVD Orders

On June 3, 2015, Commerce received petitions from domestic producers requesting that Commerce impose AD and CVD duties on CORE exports from China. *Initiation of Less-Than-Fair-Value Investigations,* 80 Fed. Reg. 37,228 (Dep't of Commerce June 30, 2015). Commerce initiated AD and CVD investigations on June 30, 2015. *Id.*; *Initiation of Countervailing Duty Investigations*, 80 Fed. Reg. 37,223 (Dep't of Commerce June 30, 2015). In July 2016, Commerce published AD and CVD orders on CORE from China. *Antidumping Duty Orders*, 81 Fed. Reg. 48,390 (Dep't of Commerce July 25, 2016); *Countervailing Duty Orders*, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25, 2016).

CORE is a type of steel that is clad, plated, or coated with corrosion-resistant metals. *Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 8841 (Dep't of Commerce Feb. 18, 2020) and accompanying Memo ("Preliminary Determination") at 5–7. CORE is used, for example, to make appliances and vehicle parts. *Id.* at 14, 17; Op. Br. at 4. The exact manner in which CORE is manufactured depends on the CORE's intended application, but it is generally as follows.

CORE production typically begins with one of two methods for producing molten steel. Preliminary Determination at 14. The first method uses an electric arc furnace to melt metallic raw material, including scrap steel, pig iron, and direct-reduced iron. *Id.* The second method uses a blast furnace to melt iron ore, coke, and smaller amounts of scrap steel. *Id.* Once the molten steel is produced, it is cast into a "slab." *Id.* The slab is then reheated and rolled on a mill to produce hot-rolled steel, which is typically reeled into a coil. *Id.* The hot-rolled steel is then uncoiled and passed through vats of acid to remove oxide scale. *Id.* Next, the hot-rolled steel may be processed into cold-rolled steel by cold-rolling (to reduce its thickness) and annealing (to harden it). *Id.*

The substrate for CORE is usually cold-rolled steel, but hot-rolled steel may be used to produce some CORE products. *Id.* at 13. The hot-dip and electrolytic processes are the two most common processes for producing the final CORE product from the hot-rolled steel or cold-rolled steel. *Id.* at 14. The hot-dip process passes the substrate through a bath of molten zinc or aluminum. *Id.* The electrolytic process passes the substrate through electrolytic cells to plate zinc or other metals onto the substrate's surface. *Id.*

Al Ghurair Iron & Steel ("AGIS") is a steel manufacturer based in the UAE. AGIS began producing CORE in 2008. Op. Br. at 11. AGIS does not manufacture hot-rolled steel but purchases it from steel manufacturers in China and other countries. *Id.* at 5, 8, 18–19. AGIS sometimes purchases cold-rolled steel from China and other countries and other times makes it in house. *Id.* AGIS's facilities create the end CORE products by further processing the hot-rolled steel and cold-rolled steel as discussed above and by completing any additional post-processing steps necessary to meet customer demands (recoiling, cutting to size, etc.). *See id.* at 6–7.

Commerce's Circumvention Determinations

"The Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries. . . ." *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1196 (Fed. Cir. 2014); *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019). First, Commerce may impose an antidumping duty on goods "sold in the United States at less than . . . fair value." 19 U.S.C. § 1673(1). Second, Commerce may impose a countervailing duty on goods that receive "a countervailable subsidy" from a foreign government. *Id*. § 1671(a). Antidumping duties remedy unfair trade acts on the part of importers, while countervailing duties are directed towards the unfair trade acts of foreign governments. *Guangdong Wireking Housewares & Hardware*, 745 F.3d at 1196.

Often, when AD and CVD orders are imposed, the marketplace reacts to the requirement for the payment of the additional AD and CVD duties. One such reaction is the circumvention of the duty orders. 19 U.S.C. § 1677j allows Commerce to initiate investigations and make determinations that prevent companies from circumventing AD and CVD orders, such as by transshipping the goods subject to duties through another country.

In August 2019, Commerce initiated investigations to determine whether exports of CORE from the UAE were circumventing the China CORE AD and CVD orders. Preliminary Determination at 1. In February 2020, Commerce issued its preliminary determination. Commerce preliminarily determined that the UAE's CORE exports to the U.S. made from hot-rolled steel or cold-rolled steel manufactured in China were circumventing the AD and CVD orders. Thereafter, Commerce received comments from interested parties, including AGIS. AGIS argued that Commerce's preliminary determination was flawed in several aspects. In July 2020, Commerce issued its final

affirmative determination, rejecting AGIS's arguments and concluding that CORE from the UAE circumvented the AD and CVD orders. *Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (Dep't of Commerce July 13, 2020) and accompanying Memo ("Final Determination").

In its preliminary and final determinations, Commerce analyzed each Section 1677j(b) factor and subfactor. Relevant here are Commerce's findings as to the Section 1677j(b)(3) factor of UAE's "pattern of trade." Also relevant are Commerce's findings as to the "level of investment," "nature of the production process," "extent of production facilities," and "value added" subfactors for determining whether UAE processing is "minor or insignificant" under Section 1677j(b)(1)(C).

For the "pattern of trade" factor, Commerce chose to analyze 49 months before and after the date Commerce initiated the investigations that led to the China CORE AD and CVD orders. Final Determination at 12–13. Commerce explained that this allowed it "to compare the trade patterns prior to the discipline of any AD and CV[D] duties with the trade patterns present when parties were aware that they could potentially have to pay AD and CV[D] duties." *Id*. at 13. Commerce also explained that the period was consistent with prior determinations. *Id*. at 13 n.51 (collecting cases).

Commerce made several findings before concluding that the "pattern of trade" factor evidenced circumvention. Commerce analyzed data concerning the UAE as a whole and found that after the initiation of the CORE investigations, the average monthly volume of imports of cold-rolled steel and hot-rolled steel into the UAE from China increased by 47.01% and 35.01%, respectively. *Id*. at 12; Preliminary Determination at 24 (citing Global Trade Atlas data). Commerce further found that the average monthly volume of exports of CORE from the UAE to the United

States increased by 5,752.06% (almost four hundred thousand metric tons) during the same period. Preliminary Determination at 25.

Commerce also considered AGIS's data for the "pattern of trade" factor.[1] Commerce explained that AGIS's purchases of cold-rolled and hot-rolled steel from China increased thousands of percent in the 49-month period after the CORE investigation began. In that same period, AGIS's exports to the U.S. of CORE made from Chinese substrate substantially increased. Commerce found that these data indicated a "pattern of trade" evidencing circumvention. Final Determination at 8, 11–13.

Commerce also analyzed whether the UAE's processing of hot-rolled and cold-rolled steel into CORE was "minor or insignificant" compared to making the substrates in China. For the "level of investment" subfactor, Commerce found that "the average expenditure for construction of an integrated steel mill in China is [$3.6 billion,] roughly 15 times greater than that required to build [] facilities" present in the UAE. *Id*. at 17 (comparing investments in Chinese integrated steel facilities to that invested by a UAE manufacturer); Preliminary Determination at 15. Commerce looked at AGIS's investment data and likewise found that AGIS's facilities required significantly less investment than the average integrated steel mill in China. Commerce explained that its conclusions regarding these findings were consistent with prior CORE cases involving circumvention. Preliminary Determination at 15–16; Final Determination at 18.

Commerce also determined that the "nature of the production process" and "extent of production facilities" subfactors supported an affirmative finding of circumvention.

---

[1]    AGIS's data that Commerce relied on are confidential and have not been included in this opinion.

Commerce explained that the UAE's CORE manufacturing process—which includes thinning, coating, and cutting to make the final CORE product—was insignificant compared to the much more numerous, complicated, and expensive processes completed in China to make the substrate. Final Determination at 18–19. Again, Commerce found its analysis consistent with prior CORE determinations. *Id.* at 19; Preliminary Determination at 18–19.

Commerce concluded that the "value added" subfactor supported circumvention. Commerce found that AGIS increased the products' value by an amount it deemed insignificant. In making this calculation, however, Commerce did not adopt AGIS's argument that Commerce should limit its dataset to just U.S. sales.

Commerce additionally analyzed global data from MEPS International's World Carbon Steel price database and found that from 2013 to 2016 "the value-added by CORE producers . . . [was] approximately 10 percent to 31 percent, depending on whether the underlying substrate was already cold-rolled." Preliminary Determination at 21. Commerce found that MEPS data from 2018 indicated that processing hot-rolled and cold-rolled steel to CORE increased the products' value by 13 to 22 percent. *Id.* at 21–22. Commerce explained that, although these data were not specific to the UAE, they were still probative because methods used to process hot-rolled or cold-rolled steel to CORE did not substantively vary across different countries. *Id.*

Commerce concluded that "the value of the [hot-rolled and/or cold-rolled steel] produced in China . . . is a significant portion of the total value of the completed . . . CORE[] exported to the United States." Final Determination at 9. Commerce explained that this determination was consistent with prior cases involving different countries, which likewise concluded that processing hot-rolled or cold-rolled

steel to CORE did not add significant value to the imported good.  Preliminary Determination at 21.

Commerce reached a final affirmative circumvention determination, finding that UAE exports of CORE made from Chinese hot-rolled steel or cold-rolled steel circumvented the AD and CVD orders covering shipments of CORE from China.  Preliminary Determination at 27–28; Final Determination at 25.

AGIS challenged Commerce's findings in the Court of International Trade, which affirmed Commerce's determination. *Al Ghurair Iron & Steel v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021).  AGIS appeals to this court.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review a judgment of the Court of International Trade de novo, reapplying the same standard of review applied by that court in its review of Commerce's affirmative circumvention determination. *See NEXTEEL Co. v. United States*, 28 F.4th 1226, 1233 (Fed. Cir. 2022).  As such, we review Commerce's findings for substantial evidence. *Id.* Substantial evidence is "evidence that a reasonable mind might accept as adequate to support a conclusion." *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840 (Fed. Cir. 2020) (citation omitted); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("Commerce's special expertise in administering the anti-dumping law entitles its decisions to deference from the courts").

DISCUSSION

Under Section 1677j(b)(1), Commerce may find and address circumvention if:

(A) [the] merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of . . . [an AD and/or CVD order],

(B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which . . . is subject to [the] order . . . or . . . is produced in the foreign country . . . to which such order . . . applies,

(C) the process of assembly or completion in the foreign country . . . is minor or insignificant,

(D) the value of the merchandise produced in the foreign country . . . is a significant portion of the total value of the merchandise exported to the United States, and

(E) . . . action is appropriate . . . to prevent evasion of such order.

To determine whether the process of assembly or completion is "minor or insignificant" (element C above), Commerce "shall take into account:"

(A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country,

(C) the nature of the production process in the foreign country,

(D) the extent of production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

19 U.S.C. § 1677j(b)(2)(A)–(E).

Under Section 1677j(b)(3), Commerce is also required to consider "(A) the pattern of trade, including sourcing patterns, (B) whether the manufacturer or exporter of the

merchandise . . . is affiliated with the person who uses the merchandise . . . to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States, and (C) whether imports into the foreign country of the merchandise . . . have increased after the initiation of the [AD/CVD] investigation."

We conclude that substantial evidence supports Commerce's determinations as to "pattern of trade," "level of investment," "nature of the production process," and "extent of production facilities." Commerce erred by failing to explain its factual findings for the "value added" subfactor, as applied to AGIS's financial data. But because Commerce's preliminary and final determinations provide multiple other reasons supporting its circumvention finding, we conclude that this error is harmless.

1.   "Pattern of Trade"

AGIS argues that substantial evidence does not support Commerce's determination that there is a "pattern of trade" indicating that the UAE is circumventing the China CORE AD and CVD orders. Op. Br. at Section V. We disagree.

First, AGIS argues that Commerce erred because it was "arbitrary" for Commerce to rely on the 49 months before and after the China CORE investigations began. *Id.* at 43–44.

Commerce's timeframe selection was not arbitrary. Commerce reasonably explained that the period allowed it to analyze whether the trade patterns changed in reaction to the AD and CVD orders' investigations, when parties learned that "they could potentially have to pay AD and CV[D] duties." Final Determination at 13. Commerce also reasonably found that this period was consistent with its prior determinations. *Id.* at 13 n.51 (collecting cases).

Second, AGIS contends that the 49-month timeframe was "contrary to law." Op. Br. at 43. But AGIS has

provided no legal authority supporting this argument.  In fact, AGIS concedes that the statute "does not identify any particular time periods at all for Commerce to consider for this factor."  *Id*. at 44.

Third, AGIS identifies data specific to AGIS that it argues show that Commerce's decision is unsupported by substantial evidence.  *Id*. at 43–48.  For instance, AGIS claims that it has not shipped CORE to the United States made from Chinese hot-rolled or cold-rolled steel since December 2017.  *Id*. at 45–46.  Commerce reasonably explained that its analysis was country-wide, so AGIS-specific data were less probative than the data concerning the UAE as a whole.  Final Determination at 9–13.  AGIS does not challenge Commerce's findings as to the "pattern of trade" that it based on UAE data.  To the extent that AGIS is asserting that Commerce should have found AGIS-specific data more probative than UAE data, we recognize that substantial evidence review does not permit us to reweigh the evidence.  *See Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (substantial evidence review does not "allow the parties to retry factual issues before us de novo").

In addition, while some of AGIS's data arguably support AGIS's position, other evidence does not.  *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) ("Commerce's finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." (citation omitted)).  AGIS does not dispute Commerce's factual finding that immediately after the initiation of the CORE investigation, AGIS's purchases of cold-rolled and hot-rolled steel from China skyrocketed.  Nor does AGIS dispute Commerce's factual finding that AGIS exported significantly more CORE into the U.S. made from Chinese substrate during that same

timeframe. Commerce reasonably relied on these data as a "pattern of trade."[2]

Thus, substantial evidence supports Commerce's finding that the Section 1677j(b)(3)(A) "pattern of trade" factor evidenced circumvention.

### 2. "Level of Investment"

AGIS argues that Commerce erroneously analyzed the UAE's "level of investment" in determining that the UAE's contribution was "minor or insignificant." Op. Br. at Section III (discussing 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2)(A)). We find that substantial evidence supports Commerce's decision as to this subfactor.

First, AGIS asserts that since it "was established in 2005, it has continued to make sustained investments and re-investments in its production capabilities, significantly adding to its assets and expanding its production operations." Op. Br. at 27–28. AGIS asserts that its company's assets are worth a significant amount. *Id.* AGIS argues that its value is comparable to the value of the smallest Chinese steel mills. *Id.* at 35–36.

These factual disputes do not establish a lack of substantial evidence. *Inland Steel*, 188 F.3d at 1359. Commerce reasonably rejected these arguments when it determined that AGIS's investments were vastly lower than the amount needed to construct the *average* steel mill in China. Preliminary Determination at 15; Final Determination at 17. Commerce did not err simply because

---

[2]    Commerce declined to determine whether AGIS intended to circumvent the AD and CVD orders, because "intent is not a necessary element of a finding of circumvention." Final Determination at 13–14. No party challenges this decision.

AGIS's valuation is similar to Chinese steel mills on the extremely low end of the valuation spectrum.

Second, AGIS argues that Commerce legally erred by comparing AGIS's investment to make CORE with Chinese manufactures' investment to make hot-rolled or cold-rolled steel. Op. Br. at 32–33. AGIS argues that Commerce should have only compared AGIS's CORE investment to the investments of Chinese CORE producers. *Id.*

AGIS provides no binding authority supporting this argument. Commerce reasonably explained that its comparison "indicate[d] what portion of the total value of the merchandise subject to these inquiries is accounted for by the last step of processing." Final Determination at 18.

Third, AGIS argues that Commerce erred by failing to conform its analysis to its past practices. *See* Op. Br. at 29–30, 32, 34–35. We disagree.

Commerce is not bound by its prior determinations. *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021) ("We have rejected the notion that Commerce is forever bound by its past practices. Instead, each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." (citations omitted)); Reply. Br. at 20 (conceding that "Commerce must make circumvention determinations on a case-by-case basis."). Commerce must, however, explain itself, which it did for this subfactor. *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom."). And Commerce's analysis here *is* consistent with its prior determinations. Commerce correctly identified multiple other cases—including prior CORE cases—where Commerce analyzed the imported goods in terms of the entire manufacturing process, not just the final steps. *See*

Preliminary Determination at 16 nn.68–69 (collecting cases); Final Determination at 18 n.80.

We disagree with AGIS that Commerce erred by acting contrary to its determination in *Hot-Rolled Lead*. *See, e.g.*, Op. Br. at 34–35 (discussing *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 Fed. Reg. 40336 (Dep't of Commerce July 26, 1999)). That is a non-binding decision from 1999, and the products considered were different from those at-issue here.

In sum, substantial evidence supports Commerce's determination that the UAE's "level of investment" is minor and insignificant.

### 3.   "Nature of the Production Processes" and "Extent of the Production Facilities"

AGIS asserts that Commerce erroneously analyzed the "nature of the production processes" and "extent of production facilities" in the UAE to determine that the UAE's contribution was "minor or insignificant," evidencing circumvention. Op. Br. at Section III (discussing 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2) (C)–(D)). We disagree and find that substantial evidence supports Commerce's decision for these subfactors.

AGIS argues that Commerce erred because the nature of AGIS's processes and the extent of its facilities are significant. *See, e.g.*, Op. Br. at 29 ("AGIS's production process requires multiple sub-stages and different equipment. . . ."); *id*. at 30 ("AGIS's situation hardly involves unskilled labor and limited and minor production."); *id*. at 31 ("AGIS's operations are extensive and sophisticated. . . ."). We reject these arguments as improper attempts to relitigate facts on appeal. *Inland Steel*, 188 F.3d at 1359. Commerce reasonably found that the UAE's CORE manufacturing processes and facilities, including those at

AGIS, are insignificant as compared to the more numerous, complicated, and expensive processes and facilities in China. Preliminary Determination at 18–20; Final Determination at 8, 18. Its determination is supported by substantial evidence.

Next, citing *Certain Tissue Paper Products*, AGIS argues that Commerce is acting contrary to its prior applicable determinations. Op. Br. at 29–30 (discussing *Certain Tissue Paper Products from China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 Fed. Reg. 14514 (Dep't of Commerce Mar. 6, 2013) and accompanying Memo)). In *Certain Tissue Paper Products*, in finding circumvention, Commerce determined that most of the processing occurred in China—the paper was essentially made there. *Certain Tissue Paper Products Memo* at 5–6 ("[W]e preliminarily find that the production process conducted by ARPP in converting the . . . jumbo rolls to cut-to-length tissue paper is limited and minor"). The investigated Indian company merely completed the final manufacturing steps, such as cutting the paper. *Id.*

We find that *Certain Tissue Paper Products* is consistent with Commerce's analysis here. In this case, Commerce similarly found that the most complex processing occurred in China and that the UAE producers merely completed final, relatively minor processing steps.[3] Preliminary Determination at 14, 18–19.

---

[3] Even if *Certain Tissue Paper Products* involved a different analysis by Commerce, it is non-binding. *Hyundai Elec. & Energy Sys.*, 15 F.4th at 1089. Commerce's findings as to this subfactor are reasonably explained and consistent with findings in prior cases involving CORE produced in other countries. *See* Preliminary Determination at 19–20 (collecting cases).

Thus, substantial evidence supports Commerce's determinations as to the "nature" and "extent" subfactors.

### 4.    "Value Added"

AGIS argues that substantial evidence does not support Commerce's decision that the UAE's processing steps add an insignificant "value" to its CORE products. *See* Op. Br. at Section IV (discussing 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2)(E)).    AGIS asserts that "Commerce ignored AGIS's calculations and failed to explain why it was appropriate to use in its calculations company-wide profit amounts instead of the actual profit on U.S. sales of CORE produced with Chinese [hot-rolled and cold-rolled steel] substrate." *Id*. at 42.    AGIS states that had Commerce adopted the narrower U.S.-only dataset, Commerce would have calculated AGIS's "value added" to be much higher than the percentage Commerce determined.[4] *Id.*

Appellees argue that Commerce did not have to explain why AGIS's calculations were wrong.    The government

---

[4]    AGIS also argues that Commerce's final circumvention determination is unsupported by substantial evidence because Commerce failed to explain why it considered the percentage of value added by AGIS to be insignificant.    Op. Br. at 40–41.    We reject this argument because Commerce's explanation—that the value added was insignificant in view of prior CORE cases making similar findings and the other facts of the case—was reasonable and supported by substantial evidence.    Preliminary Determination at 20–21; Final Determination at 17–20.    AGIS also fails to identify anything Commerce could or should have said.    Op. Br. at 38, 40–41; Reply Br. at 9 (conceding that "Commerce should not be held to a numerical or 'bright-line' test in considering the value added in third-country processing").

asserts that if Commerce were required to explain why AGIS's calculations were wrong "there might be no end to the analyses [Commerce] would have to perform." Oral Arg. at 32:20–32:45 (government's counsel); *see also id.* at 38:50–39:10 (Steel Dynamics' counsel making a similar argument).

Appellees also contend that the following passage from Commerce's preliminary determination is a sufficiently adequate explanation:

> Commerce preliminarily finds that the formula AGIS used in its analyses is unpersuasive because Commerce is determining what the further processing cost is as a percentage of the total U.S. sales price; the statute does not require use of AGIS's preferred formulas and its analyses do not override Commerce's conclusion with respect to this factor.

Preliminary Determination at 22.

While Commerce must reasonably explain its findings, its explanations are not required to reach a certain level, only that they are sufficient to afford adequate review. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[W]hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). Without a reasonable explanation, this court cannot "meaningful[ly] review" Commerce's decision. *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (citation omitted); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review."). Nor can we "supply a reasoned basis for [Commerce's] action that [Commerce] itself has not given." *NEXTEEL*, 28 F.4th at 1237 (citation omitted).

This does not mean that Commerce's written decision must address "every argument raised by a party or explain every possible reason supporting its conclusion." *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016); *see also Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018) ("[F]ailure to explicitly discuss every . . . minor argument does not alone establish that the [agency] did not consider it."). But we must be able to determine that Commerce at least considered counterarguments to its position. *Id.*; *see also BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019) (finding that Commerce erred when it "largely ignored" a party's counterargument and failed to articulate any rational for a finding).

Commerce erred here because it did not reasonably explain why it rejected AGIS's calculations. We disagree with Appellees' hyperbole that it would have been impossible or highly burdensome for Commerce to explain why AGIS's calculations were wrong. This case involved only a few active participants. *See* Final Determination at 2–3; *see also* Oral Arg. at 37:40–50 (Steel Dynamics' counsel explaining that the case involved "one company that was an active participant as a respondent"). This was one of AGIS's main arguments and was squarely before Commerce. *See Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022) (finding that substantial evidence did not support Commerce's decision to invoke adverse inferences and apply partial facts where Commerce provided "[n]o reasonable justification" to do so). AGIS's calculations apparently used the same formulas as Commerce but only included a smaller subset of data. Op. Br. at 37–43; Reply Br. at 5–6; Oral Arg. at 35:48–36:40 (Steel Dynamics' counsel conceding that all Commerce had to do was explain why using U.S.-only data in the formulas was misleading).

We agree that Commerce's explanation was insufficient. We are unable to conclude that Commerce even considered AGIS's argument, and Commerce's discussion is

limited to a single paragraph that is vague and conclusory
and wholly fails to explain why Commerce believed that
using AGIS's dataset would be improper.[5]  In fact, Com-
merce's meager explanation suggests that it may have mis-
understood AGIS's position because Commerce stated that
it did not need to use "AGIS's preferred formulas"—but
AGIS used the same formulas as Commerce.  Preliminary
Determination at 22.  In sum, substantial evidence does
not support Commerce's determination as to AGIS's "value
added."

### 5.   Harmless Error

Because we find that substantial evidence does not sup-
port Commerce's determination as to the "value added"
subfactor, we must consider the overall effect of this error
and whether a remand is necessary.  *Suntec Indus. Co.,
Ltd. v. United States*, 857 F.3d 1363, 1372 (Fed. Cir. 2017)
(applying a harmless error analysis); *Intercargo Ins. Co. v.
United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well
settled that principles of harmless error apply to the review
of agency proceedings.").  We conclude that Commerce's er-
ror was harmless.  Commerce's finding of circumvention in-
volved a multi-factor test and was supported by many
findings other than its calculation of AGIS's value added.

Commerce's determination was country-wide, so its
analysis of AGIS's value added data was only one part of
the broader inquiry for this subfactor.  AGIS does not

---

[5]    The government also argued at oral argument that
Commerce explained itself by stating, "even if AGIS's
profit, financial expenses, and SG&A were added to the
value-added  percentage  calculation,  the  percentage  of
value added does not materially change."  Final Determi-
nation at 20; Oral Arg. at 31:30–32:20.  This explanation
does not address the relevant question of why Commerce
declined to use AGIS's narrower dataset.

appeal Commerce's determination that global data indi-
cated a value added of 10% to 31% and that this data accu-
rately described the value added by UAE production.
Preliminary Determination at 21. Thus, we conclude that
Commerce's overall determination does not require rever-
sal or correction on remand.

CONCLUSION

Commerce's determination as to the UAE's "pattern of
trade," "level of investment," "nature of the production pro-
cess," and "extent of production facilities" is supported by
substantial evidence. While Commerce's analysis for the
"value added" subfactor is not reviewable and is therefore
not supported by substantial evidence, this error was
harmless in view of Commerce's other supported findings.
We have considered AGIS's remaining arguments and find
them unpersuasive. We affirm the Court of International
Trade's judgment and Commerce's affirmative determina-
tion of circumvention.

**AFFIRMED**

COSTS

No costs.